UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| KEITH CROSSAN | : | CIVIL ACTION NO. 2:18-cv-0629 |
| --- | --- | --- |
| VERSUS | : | |
| LOUISE CLOHESSY | : | MAGISTRATE JUDGE KAY |

## AMENDED WRITTEN REASONS FOR JUDGMENT

This matter arises from a petition filed by Keith Crossan, a citizen of Ireland, under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*[1] Doc. 1. Crossan seeks return of his minor child M.T.C.C. to Ireland after the child's mother, Louise Clohessy, removed M.T.C.C. to the United States without Mr. Crossan's knowledge or consent.

The parties consented to proceed before the undersigned. Docs. 27, 28. Trial was held on this matter, concurrently with a hearing on Mr. Crossan's Motion for Preliminary Injunction [doc. 3], in this court from May 30 to May 31, 2018. Based on the evidence adduced at those proceedings, we ruled from the bench in open court. *See* doc. 31; doc. 31, att. 1 (transcript of bench ruling). This court originally issued Written Reasons for Judgment on June 5, 2018, in order to memorialize that ruling. Doc. 38. Now that the transcripts in this matter have been placed under seal, we hereby **RESCIND** our prior written reasons [doc. 38] and issue this amended opinion in

---

[1] Mr. Crossan initiated proceedings in the United States District Court for the Northern District of Georgia, where he then believed Ms. Clohessy and the minor child to be, on April 2, 2018. *In re Crossan v. Clohessy*, No. 1:18-cv-1395, doc. 1 (N.D. Ga. Apr. 2, 2018). He states that, while attempting to serve Ms. Clohessy in that district, he learned that she had relocated with the child to the jurisdiction of this court. Doc. 1, p. 5. He then filed the instant petition on May 10, 2018.

order to more fully explain the court's ruling. No change has been made to the judgment, and the opinion herein reflects the findings made by the court on May 31, 2018.

The Hague Convention is in force between the United States and Ireland, and is implemented here by the ICARA, *supra*, 22 U.S.C. § 9001 *et seq.* Under the ICARA, United States courts may only decide "rights under the Convention and not the merits of any underlying child custody claims." *Id.* at § 9001(b)(4). The purpose of this limitation is to implement the Convention's primary goals of "restor[ing] the pre-abduction status quo . . . and deter[ring] parents from crossing borders in search of a more sympathetic court." *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000). Thus, "[t]he Convention's central operating feature is the return remedy." *Abbott v. Abbott*, 130 S.Ct. 1983, 1989 (2010).

Under the Convention, wrongful removal occurs when (1) a parent takes or retains the child outside of his country of habitual residence, (2) the removal/retention breaches the custody rights of the non-removing parent under the laws of that country, and (3) the non-removing parent was exercising or attempting to exercise his custody rights at the time of the removal or retention, or would have exercised those rights but for the wrongful removal or retention. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004); *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012). It is the petitioner's burden to establish these factors by a preponderance of the evidence. *Larbie*, 690 F.3d at 307; 22 U.S.C. § 9003(e)(1). In order to avoid crossing the line into a resolution of the merits of the underlying custody dispute, "[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Sealed Appellant*, 394 F.3d at 344–45 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996)). Once that burden is met, the respondent then has the burden of showing that

an affirmative defense applies in order to overcome the return remedy. 22 U.S.C. § 9003(e)(2); *see also Sealed Appellant*, 394 F.3d at 342–43. The respondent's burden depends on the defense asserted. 22 U.S.C. § 9003(e)(2).

Under Irish law, unmarried fathers such as Mr. Crossan are not considered custodians of right but may attain that status under the "cohabitating provisions" of The Guardianship of Infants Act of 1964, as amended by The Children and Family Relationships Act of 2015. Under The Guardianship of Infants Act, as amended, an unmarried father obtains rights of guardianship if he was a cohabitant with the mother for at least twelve consecutive months, three of which occur "at any time after the birth of the child . . . during which both the father and mother have lived with the child." Guardianship of Infants Act, as amended, § 6B(3). This amendment is effective prospectively from January 18, 2016. *See id.* at annotation C10 to § 6B; *available at* http://www.lawreform.ie/_fileupload/RevisedActs/WithAnnotations/HTML/EN_ACT_1964_0007.htm#SEC6B. For purposes of the Convention as well and assuming that the non-removing parent has custody rights, that parent must also have been exercising or attempting to exercise his guardianship rights by keeping regular contact with the child at the time of removal.

Here the court is being asked to make several determinations that have not been definitively determined by Irish courts. One suggested by counsel for respondent is the meaning of "three consecutive months" required for the father, mother and child to "cohabitate" before these legal, custodial rights of the unmarried father vest. Before turning to the facts, the court addressed this issue. We do not believe that the law as written was intended to require an unmarried father to be under the same roof as the mother and child continuously, without interruption for whatever reason, for a three month period before his rights would vest. To apply the law as suggested would mean that any unmarried father who, like Mr. Crossan, is often absent from the home overnight as

a result of his work would have to begin his three month period anew when he returns, even if the parties intended to maintain a shared family home. We will not apply the three month provision as suggested by respondent and as more fully discussed below.

Also before addressing the merits we note that, through her testimony and that of her parents, respondent attempted to suggest that the relationship between her and petitioner was not physical in nature following the birth of the child. The civil partnership and cohabitants statute referenced by petitioner's counsel requires the relationship between the cohabitants to be an intimate one for the rights under that statute to accrue, but notes that "a relationship does not cease to be an intimate relationship . . . merely because it is no longer sexual in nature." Civil Partnership and Certain Rights and Obligations of Cohabitants Act of 2010, § 172(3). Accordingly, we disregard all testimony about when the parties' sexual relationship ended.

With these conclusions in mind, we turn to our findings on the evidence.

The parties agree that M.T.C.C. was removed from Ireland, his habitual residence, on August 28, 2017, by his mother, Louise Clohessy and without the permission of his father, Keith Crossan. In these proceedings both parties appeared before the court and introduced documentary and testimonial evidence. At the heart of the matter is their dispute over the nature and duration of their relationship, their "cohabitation," and the rights of custody that may or may not have been acquired by Mr. Crossan under the Irish law cited above through that relationship and "cohabitation." This requires us to make a factual determination of whose account of events prevails which, in turn, requires us to make credibility determinations.

Not at issue is the fact that the child, M.T.C.C., was born in Ireland on September 30, 2016, to Keith Crossan and Louise Clohessy, an unmarried couple who began to cohabitate in Dublin, Ireland, in September 2015. What is in dispute is when that relationship ended. Ms. Clohessy

maintains their cohabitating relationship ended at the time of M.T.C.C.'s birth, when she moved with M.T.C.C. to her parents' home in Castleconnell, County Limerick, Ireland, and Mr. Crossan moved to a house he owned in Carrick-on-Shannon, County Leitrim, Ireland. Ms. Clohessy admits that she and M.T.C.C. would visit Mr. Crossan at Carrick-on-Shannon, but maintains that their primary residence was at her parents' home and that they, therefore, did not "co-habit."

Mr. Crossan contends that Ms. Clohessy went to her parents' home after M.T.C.C.'s birth to recuperate and to await his completion of renovations at the house at Carrick-on-Shannon. He maintains that her stay was not intended to be an interruption of their arrangement and that they resided as a family in Carrick-on-Shannon until June 2017, when his relationship with Ms. Clohessy ended. That conclusion came when she packed her possessions into a white van and moved out of the home along with M.T.C.C. It is Mr. Crossan's position that he, Ms. Clohessy, and the child "co-habited" as a family throughout that period, even though there were periods of time when she would visit with her parents.

After reviewing all the evidence in this matter, and for reasons assigned in open court [doc. 31, att. 1] we find that Mr. Crossan has established by a preponderance of the evidence that the co-habitating relationship between these individuals existed from September of 2015 until Ms. Clohessy removed her belongings and those of the minor child from the home in Carrick-on-Shannon in June of 2017. The period of time in which Mr. Crossan was renovating the home in Carrick-on-Shannon and Ms. Clohessy was recuperating from childbirth at her parents' home did not represent a break in their consecutive cohabitation. Nor was the period of cohabitation interrupted by any of Ms. Clohessy's visits to her parents' home from November 2016 to June 2017, during which period witness testimony and documentary evidence reflect that she considered and held Carrick-on-Shannon out as her family residence with M.T.C.C. and Mr. Crossan.

The fact of the parties' ongoing co-habitating relationship throughout this time was amply supported by Facebook messages between Mr. Crossan and Ms. Clohessy referring to their shared home and status as a family, as cited in the court's bench ruling; the fact that M.T.C.C.'s birth certificate, completed in December 2016, lists Carrick-on-Shannon as the current residence for both parents[2]; the fact that Ms. Clohessy received correspondence from the Department of Social Welfare Services at the address in Carrick-on-Shannon as late as February 2018[3]; the fact that M.T.C.C. received his immunizations, through May 2017, in Carrick-on-Shannon and had a prescription filled there in February 2017[4]; and the fact that the house at Carrick-on-Shannon was fully furnished for an infant, to the point where multiple witnesses testified that Ms. Clohessy required a truck to move out their belongings in June 2017. Additionally, neighbors of Ms. Clohessy and Mr. Crossan in Carrick-on-Shannon testified that they interacted with the family during this period and that Ms. Clohessy acted as if Carrick-on-Shannon was her residence. On the other hand, Ms. Clohessy relied largely on her own account and that of her parents' to establish that she and M.T.C.C. were actually residing in County Limerick during this period. For reasons more fully explained in our bench ruling, we determined that the Clohessys' accounts were contradicted by the documentary evidence and tainted by the negative feelings they expressed toward Mr. Crossan.

The parties do not appear to dispute that Mr. Crossan was exercising his rights as a father, and we likewise find that he did so through his contact with his child from birth through August 28, 2017, when Ms. Clohessy prevented any further contact by removing the child from the country without Mr. Crossan's knowledge or consent and concealing his whereabouts.

---

[2] Doc. 35, att. 2.
[3] Doc. 35, att. 10.
[4] Doc. 35, atts. 12, 14.

Accordingly, Mr. Crossan has shown, by a preponderance of the evidence, that at the time of M.T.C.C.'s removal from Ireland that he (Mr. Crossan) had and was exercising rights of guardianship over M.T.C.C. under the cohabitating provisions of The Guardianship of Infants Act of 1964, as amended by the Children and Family Relationships Act of 2015, (1) because he had cohabitated with Louise Clohessy for at least twelve consecutive months from January 18, 2016 (when the cohabitation provisions of The Guardianship of Infants Act became effective), onward, and for at least three consecutive months within that period with both Ms. Clohessy and their child, M.T.C.C., and (2) because he was attempting to exercise his guardianship rights under Irish law by keeping regular contact with the child at the time of removal.

Ms. Clohessy has not raised any affirmative defense, except the one waived before the trial on this matter began. *See* doc. 29. Therefore Ms. Clohessy's removal of M.T.C.C. from Ireland to the United States violated the Hague Convention and ICARA, under which Mr. Crossan instituted proceedings in this court, and Mr. Crossan's petition for return of the child must be granted. The petition was **GRANTED** as to the request for return, and the motion for preliminary injunction **DENIED AS MOOT**. The court ordered the return of the child to Ireland by June 7, 2018, with costs of the proceedings assessed to Ms. Clohessy and the issue of Mr. Crossan's entitlement to other costs and fees deferred. Docs. 31, 32.

THUS DONE this 27th day of July, 2018.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE